☐ Original    ☐ Dup[licate]

CLERK'S OFFICE
A TRUE COPY
Jul 31, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>an Apple iPhone assigned FBI Evidence<br>Number 1B210 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **25-M-481 (SCD)** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____8-14-25_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Stephen C. Dries, U.S. Magistrate Judge_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:       7-31-25. 8:45 am                    *Stephen C. Dri[signature]*
                                                                                              *Judge's signature*

City and state:    Milwaukee, Wisconsin                    Stephen C. Dries, U.S. Magistrate Judge
                                                                                     *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_Executing officer's signature_

_Printed name and title_

## ATTACHMENT A

The property to be searched is an Apple iPhone assigned FBI Evidence Number 1B210 ("Device"). The Device is currently located at the FBI's Milwaukee Field Office, which is located in the Eastern District of Wisconsin.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 371, 511, 514, 1001, 1028A, 1956, 2312, 2313, 2321, and 2(a) and involve DEAMONTE LEE, DIAUNTE D. SHIELDS, LASHAWN DAVIS, JR., BRIANNA SHIELDS, and other co-conspirators known and unknown, since January 2019 including:

a. Information about stolen vehicles, including but not limited to photographs and videos of stolen vehicles, communications about stolen vehicles, records related to vehicle repair shops, records related to vehicle identification numbers and titles, records related to the transportation of vehicles, records related to the advertisement of vehicles, and records related to other preparatory steps taken in furtherance of the scheme;

b. Information about the existence, scope, members, and steps taken in furtherance of the conspiracy;

c. Information about false statements made by Deamonte Lee on or about June 26, 2025;

d. types, amounts, and prices of vehicles purchased, sold, and transported, as well as dates, places, and amounts of specific transactions;

e. any information related to sources of stolen vehicles (including names, addresses, phone numbers, or any other identifying information);

f. any information recording the subjects named above's schedule or travel from January 2019 to the present;

g. Evidence indicating how and when the device, call number, and email address was accessed or used, and by whom, to determine the geographic and chronological context of device access, use, and events relating to the crimes under investigation and to the account owner; and

h. Evidence indicating the device owner's state of mind as it relates to the crimes under investigation.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin



CLERK'S OFFICE:
A TRUE COPY
Jul 31, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>an Apple iPhone assigned FBI Evidence<br>Number 1B210 | )<br>)<br>)<br>)<br>)<br>)    Case No. **25-M-481 (SCD)** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the \_\_\_\_\_ Eastern \_\_\_\_\_ District of \_\_\_\_\_ Wisconsin \_\_\_\_\_, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 511, 514, 1001, 1028A, 1956, 2312, 2313, 2321, and 2(a) | Conspiracy to violate the laws of the United States, transportation of stolen vehicle, sale, receipt, possession, or concealment of stolen vehicles, transportation, presentment, or production of fictitious obligations, false statement |

The application is based on these facts:

See the attached affidavit.

❏ Continued on the attached sheet.

❏ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SHANE HOFFMANN   Digitally signed by SHANE HOFFMANN<br>Date: 2025.07.30 11:52:04 -05'00'

*Applicant's signature*

Shane Hoffmann, Special Agent (FBI)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by \_\_\_\_\_ telephone \_\_\_\_\_ *(specify reliable electronic means).*

Date: \_\_\_\_\_ 7-31-25 \_\_\_\_\_

*Judge's signature*

City and state:   Milwaukee, Wisconsin

Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT

I, Shane Hoffmann, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since approximately September 2015. Since becoming a Special Agent, I have received specialized training in conducting criminal investigations, and my responsibilities include conducting investigations of alleged criminal violations of federal laws. Through investigations and training, I am familiar with how cell phones and other technical data can be used to commit federal offenses, and I have authored numerous affidavits relating to cellular devices, cell site location information, and other technical data.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is an Apple iPhone assigned FBI Evidence Number 1B210 ("Device"). The Device is currently located at the FBI's Milwaukee Field Office, which is located in the Eastern District of Wisconsin.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      The United States, including the Federal Bureau of Investigation, is conducting a criminal investigation of a criminal enterprise led by DIAUNTE D. SHIELDS, which has stolen, transported, brokered, or sold hundreds of stolen vehicles across the nation. This investigation began in the middle of 2022. In total, the Federal Bureau of Investigation (FBI) identified and attributed approximately 700 stolen vehicles to this car theft ring, which involved stealing, altering, reselling, concealing, brokering, or buying stolen vehicles.

7.      More specifically, the investigation has revealed a nationwide criminal enterprise involved in a variety of illicit activities. The hubs of their conduct include Milwaukee, Wisconsin, Chicago, Illinois, and Atlanta, Georgia. Chief among the enterprise's activities is the theft and resale of high-end stolen automobiles including Dodge Ram TRXs, Dodge Challenger Hellcats, Cadillac Escalades, Chevrolet Corvettes, Jeep Trackhawks, Jeep SRTs, GMC Yukons, and others. The enterprise acquires the vehicles from a variety of sources, including stealing them from private properties, public parking lots including airports, rental car facilities, Turo rentals, dealerships, and assembly plants. The vehicles are often stolen utilizing key reprogramming technology. Investigators have also learned that targets utilize GPS tracking technology to track vehicles targeted for theft. To date, investigators have linked hundreds of stolen vehicles to the group with a value exceeding $10 million dollars. Although the vehicles are often sold well below market value, the actors profit significantly from the resale of vehicles.

8.      Law enforcement has identified DIAUNTE D. SHIELDS as a leader of the organization with activities dating back to at least 2019 and continuing through his arrest in Illinois on November 29, 2023. Throughout the years, numerous individuals have aided SHIELDS in his operation, including in the interstate transport of vehicles. SHIELDS has shown that he will

2

transport stolen vehicles either through the use of commercial transport companies, or via the use of "runners". Many of SHIELDS's runners have been identified as part of law enforcement's ongoing review of electronic evidence that was collected on November 29, 2023, during search warrants targeting SHIELDS.

9.      On June 24, 2025, a Grand Jury in the Eastern District of Wisconsin returned an indictment charging numerous members of this criminal enterprise with violations of 18 U.S.C. §§ 371, 511, 514, 1001, 1028A, 1956, 2312, 2313, 2321, and 2(a), and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 846. One of those defendants is DEAMONTE LEE. In the indictment, DEAMONTE LEE was charged in Counts 1, 34, and 35 with violations of 18 U.S.C. § 371 (conspiracy to violate the laws of the United States), 18 U.S.C. § 2313 (sale, receipt, possession, or concealment of stolen vehicles), and 18 U.S.C. § 2312 (transportation of stolen vehicle).

10.     A warrant for DEAMONTE LEE's arrest was issued based upon that indictment. On June 26, 2025, DEAMONTE LEE was arrested by law enforcement at 1107 South Mozart Street, 1R, Chicago, Illinois. Search incident to that arrest and an inventory search, the Device was recovered from DEAMONTE LEE.

11.     On June 26, 2025, law enforcement interviewed DEAMONTE LEE at the FBI's Chicago Field Office and stated the following in substance:

    a.  LEE's phone number was 773-968-8167. LEE has always had this phone number, but has had different cell phones attached to it. LEE's email was lawndaleohio@gmail.com. LEE identified a photograph of co-defendant DIAUNTE D. SHIELDS as "D" (hereafter referred to as SHIELDS). LEE knew of SHIELDS but did not know him personally or know his full name. SHIELDS was

3

a mutual friend. SHIELDS and LEE met while at a party at a bar called Scoreboard in Berwyn. LEE used to have SHIELDS's number in his old phone, but did not have it in his new one. The last time LEE saw SHIELDS was at a TGI Fridays in Rosemont. LEE did not remember how long ago that was.

b. LEE was asked about a storage unit at 4220 West 47th Street, Chicago, Illinois. LEE rented this storage unit for himself. LEE would store his and his brother's clothes in this storage unit. When LEE left the unit for good, he left it open. LEE left a poster, clothes, and some shoes in the unit. LEE could not remember when he had this storage unit. There could have been a number of people that knew about this unit just through conversation. SHIELDS knew about this storage unit, but LEE did not store anything for SHIELDS. SHIELDS stored things in the unit himself, including paint, clothes, and a black 2019 or 2020 Malibu. SHIELDS met LEE at the unit when SHIELDS came to store his Malibu. SHIELDS then had access to the storage unit because SHIELDS knew the code. LEE never drove or rode in the Malibu. SHIELDS did not ask LEE to rent this storage unit for him. LEE never stored guns or drugs in the storage unit.

c. LEE identified as a photo of co-defendant LASHAWN DAVIS, and said that he knew DAVIS as "Shawn" a/k/a "Lashawn" (hereafter referred to as DAVIS). LEE and DAVIS went to high school together at North Lawndale. They had mutual friends, but did not keep in contact. LEE could not recall the last time he saw DAVIS.

d. LEE was shown a photo of and asked about Vehicle 336, discussed below, but said that he had never driven or been inside this vehicle.

4

e. LEE was shown a photo of and asked about Vehicle 260, discussed below, but said that he had never driven or been inside this vehicle.

a. LEE was shown a photograph of co-defendant BRIANNA SHIELDS, DIAUNTE SHIELDS's sister, and said that he recognized the individual but could not recall her name (hereafter referred to as BRIANNA). LEE did not necessarily know BRIANNA, but had seen her go viral on the Internet. LEE had seen BRIANNA a few times, because BRIANNA's sister was a stripper and they came to a party. LEE had never been in a car with her.

b. When LEE was asked about messages discussing a trip that LEE took with BRIANNA SHIELDS to Milwaukee, LEE said that the only reason that he would go to Milwaukee was to see his sister TIERRA LEE. After more thought, LEE remembered being in the car with BRIANNA. A few days before LEE went to Milwaukee, LEE asked SHIELDS if he was going to be there. LEE was planning on taking a train to Milwaukee. SHIELDS said something to the effect of, "Bri comin' this way, catch a ride with Bri." BRIANNA drove LEE to Milwaukee in her smoke grey Charger. The Charger did not have a sunroof. This was the second time LEE had seen BRIANNA. LEE did not recall the group message between him, BRIANNA, and SHIELDS. LEE would have thought it was strange if they were talking about a title and a plate. LEE did not recall BRIANNA picking him up in Vehicle 336. LEE had been to Georgia before and would usually fly to get there. LEE had also been driven to Georgia by TOWHAN VINCENT in VINCENT's small four-door Honda or Nissan in approximately 2022 or 2023. LEE did not have his own car; he usually drove a family member's car. LEE had never been in Vehicle

5

260 and definitely did not drive it to Georgia. LEE used to work for a trucking company, so there were a few other times LEE had probably driven to or through Georgia in a truck similar to a U-Haul.

c. LEE was shown a photograph of co-defendant CHANDOR SMITH and described him as an "old school cat" that LEE knew of and has had a conversation with, but didn't really know.

d. LEE claimed that he did not recognize co-defendants GEOFFREY HARVEY, BRANDON MULLINS, JA LEAN LITTLE, NAKIYA WRIGHT, GLENN LARSEN, DEQUAS CRAWFORD-HIGGS, CASHA GRIFFIN, and other identified co-conspirators.

12. On June 20, 2025, subscriber records from T-Mobile for phone number 773-968-8167, believed to be the phone number linked to the Device, showed no associated name, an activation date of March 6, 2021, and an IMSI of 310260293509312.

13. On or about January 3, 2025, the Honorable Stephen C. Dries, U.S. Magistrate Judge of the Eastern District of Wisconsin, issued a warrant for historical records for DEAMONTE LEE's phone number 773-968-8167 from June 3, 2023, to November 28, 2023. Associated subscriber records for the phone number showed no associated name, an activation date of March 6, 2021, and an IMSI of 310260293509312.

14. On or about June 24, 2025, the Honorable William E. Duffin, U.S. Magistrate Judge of the Eastern District of Wisconsin, issued a warrant for historical and prospective location information for DEAMONTE LEE's phone number 773-968-8167 from June 1, 2025 through June 24, 2025.

15. As of April 2021 and through August 2024, call number 773-968-8167 was also linked to LEE's Cash App account in his name. LEE had rented a storage unit in Illinois which was the target of a search warrant on November 29, 2023, targeting DIAUNTE SHIELDS and associates. The storage unit contained a firearm, controlled substances, and items used to steal vehicles, including an AutoPro key fob reprogrammer. Call number 773-968-8167 was the phone number associated with LEE on the rental application. A review of one of DIAUNTE SHIELDS's Apple iPhones that was also seized during the November 29, 2023 warrants showed communication with DEAMONTE LEE on 773-968-8167 under listed contact name "Princess Diana" spanning from June 3, 2023 through November 28, 2023. LASHAWN DAVIS's cell phone seized in August 2023 had call number 773-968-8167 listed under the contact name "Tay," a nickname for DEAMONTE LEE.

### Vehicle 336: Black 2021 Dodge Charger Scat Pack

### (Manufactured VIN: 2C3CDXGJ1MH569440)

16. On approximately June 2, 2023, Vehicle 336 was stolen in Chicago, Illinois. Hours later, per evidence from SHIELDS' phone, SHIELDS sent pictures of Vehicle 336 to JAMONE HEGWOOD, utilizing phone number 262-349-5645, who indicated he was interested in Vehicle 336 and then sent $425 via Cash App to SHIELDS. SHIELDS coordinated with a known associate to obtain a fraudulent New Jersey title for Vehicle 336.

17. Based on information in SHIELDS' phone, on June 3, 2023, SHIELDS and HEGWOOD discussed the logistics of getting Vehicle 336 from Illinois to Wisconsin. SHIELDS texts, "I will get the car to the mil, I'll let you know when the T is ready and the v is on its way…." Based on my training, experience, and knowledge obtained from the case, I believe SHIELDS is

7

telling HEGWOOD that he will get Vehicle 336 to Milwaukee ("mil") and he will let HEGWOOD know when the fraudulent title ("T") is ready.

18. Based on information from SHIELDS' phone, later on June 3, 2023, SHIELDS texted BRIANNA SHIELDS, "Can you pick tay up at 445?," referring to DEAMONTE LEE, whose nickname is "Tay." After BRIANNA confirms and SHIELDS provides the pick-up location, SHIELDS sent a text to BRIANNA, "…go to Tron crib grab the car and the title and head to Milwaukee follow him to Milwaukee he going back to Mozart". Based on my training, experience, and knowledge obtained from the case, I believe SHIELDS is instructing BRIANNA to pick-up DEAMONTEE LEE ("Tay") and get Vehicle 336 from a known storage location used by SHIELDS ("Tron crib") in Glenwood, Illinois. BRIANNA and LEE were instructed to drive the car to Milwaukee and then return to Illinois. Based on information from SHIELD's phone, on June 3, 2023, SHIELDS texts DEAMONTE LEE on 773-968-8167, "Can she pick you up at 445". LEE confirms. At approximately 4:45 pm, BRIANNA texted LEE at 773-968-8167 to inform LEE that she was there. BRIANNA then texts SHIELDS that their estimated arrival time is 5:40 pm. SHIELDS tells LEE and BRIANNA on a group chat to, "Make sure the title is in the car it got a plate on it". SHIELDS later texts LEE and BRIANNA the address 2023 S Kinnickinnic Avenue. BRIANNA states that they are five minutes away.

19. Based on information in SHIELDS' phone, on June 3, 2023, at approximately 7:41 pm, HEGWOOD, who was using cell number 262-349-5645, sent SHIELDS location information resolving to the vicinity of 1236 S Barclay Street, Milwaukee, Wisconsin.

20. Based on information in SHIELDS' phone, on June 4, 2023, HEGWOOD sends an image of the manufactured VIN for Vehicle 336 stamped on the vehicle. HEGWOOD texts, "This the scat. He said can y'all do the 16 on the lade, since he gotta get this fixed". SHIELDS responded:

8

"That's not something we offer fr, if I got all the way for gone need more bread that's why they be cheap". Based on my training, experience, and knowledge obtained from the case, I believe that HEGWOOD was requesting a better price of $16,000 for an Escalade ("lade") because the manufactured VIN was still on Vehicle 336. SHIELDS response indicated that they don't get rid of all the manufactured VINS, and if they did the vehicles would be more expensive.

### Vehicle 255: White 2023 Chevrolet Tahoe Premier
### (Manufactured VIN: 1GNSKSKD0PR253217)

21.     In September 2023, SHIELDS had a known associate rent Vehicle 255 in Georgia via the car sharing application Turo. During the rental period a tracking device was affixed to the battery of Vehicle 255, and a key was programmed. Approximately three days after the car was returned, the tracking device and key were used to steal Vehicle 255 as described below.

22.      Based on information in SHIELDS' phone, on September 21, 2023, SHIELDS communicated with JALEAN LITTLE, who was using cell number 773-587-1696, regarding flying to Georgia and how much money to bring. SHIELDS texts, "I got a few dollars linked up but shid you know the days change what if we can get the shit until Sunday or Monday you feel me". Based on my training, experience, and knowledge obtained from the case, I believe that SHIELDS is referring to the uncertainty of when they will be able to "get" (steal) the targeted vehicle.

23.     Based on information in SHIELDS' phone, on September 22, 2023, SHIELDS texted LITTLE on 773-587-1696 that SHIELDS will get somebody to send LITTLE some money to pay for the hotel room in Atlanta. SHIELDS has a known associate rent Vehicle 255 from September 22 through September 24. SHIELDS then sends LITTLE a picture of a white Tahoe on 773-587-1696 and SHIELDS states, "I put this play together". LITTLE responds, "What I gotta

9

do drive it". SHIELDS then states, "Nah take back lmao". Based on my training, experience, and knowledge obtained from the case, I believe that SHIELDS is telling LITTLE that SHIELDS plans on stealing the vehicle and he needs LITTLE's assistance.

24. Based on information in SHIELDS' phone, on September 24, 2023, tracking data obtained from Optimus Trackers showed a vehicle tracker location resolving to the Hyatt Place in Atlanta, Georgia, where I believe SHIELDS and LITTLE had rented a hotel room.

25. Based on information in SHIELDS' phone, on September 25, 2023, JAMONE HEGWOOD uses phone number 414-791-2849 to text SHIELDS, "The Tahoe comin tmr 2?" SHIELDS responds that it isn't and tells HEGWOOD to wait.

26. On September 26, 2023, Vehicle 255 was stolen in Atlanta, Georgia.

27. Based on information in SHIELDS' phone, at 8:10 pm on September 26, 2023, SHIELDS texts LITTLE on 773-587-1696 the address 1050 Howell Mill Rd NW, Atlanta, GA. At approximately 9:30 pm, the Optimus tracker on Vehicle 255 resolves to the vicinity of the referenced address. Based on my training, experience, and knowledge obtained through the investigation, I believe SHIELDS was relaying to LITTLE where to take Vehicle 255 after the theft, or where LITTLE should meet SHIELDS. Based on my investigation, I believe this address was used by SHIELDS and associates to store other stolen vehicles.

28. Based on information in SHIELDS's phone, on September 27, 2023, SHIELDS texted HEGWOOD on 414-791-2849, "Tahoe should be done today….." SHIELDS then communicates with known associates to obtain a fraudulent title and fraudulent VIN stickers for Vehicle 255.

29. Based on information in SHIELDS' phone, on October 1, 2023, SHIELDS sends HEGWOOD a picture of a fraudulent Georgia title with the fraudulent VIN for Vehicle 255. Based

10

on SHIELDS' phone and transport records, SHIELDS arranged for the shipment of Vehicle 255 from Atlanta, Georgia to Cicero, Illinois, with a transport date of October 4, 2023. On October 3, 2023, SHIELDS communicated with DEAMONTE LEE on call number 773-968-8167 regarding LEE flying to Atlanta after stopping at SHIELDS' residence in Illinois and getting a key.

30. Based on information on SHIELDS' phone, on October 4, 2024, LEE utilized call number 773-968-8167 to inform SHIELDS he arrived. SHIELDS provides LEE with the address of 1050 Howell Mill Road NW, Atlanta, Georgia, which was the location of Vehicle 255 per the tracking device. Transport records confirm that Vehicle 255 was picked up in Atlanta on October 4, 2023 and delivered to Cicero, Illinois, the following day.

31. Based on information in SHIELDS' phone, on October 5, 2024, SHIELDS has conversations with HEGWOOD about HEGWOOD acquiring Vehicle 255. Later in the day, the tracking device associated with Vehicle 255 showed that it was in Wisconsin.

32. Based on information in SHIELDS's phone, on October 11, 2024, SHIELDS and HEGWOOD have a conversation about his inability to register Vehicle 255 in Wisconsin because the DMV said it had a fraudulent VIN. On December 7, 2023, Vehicle 255 was eventually recovered by law enforcement in Milwaukee, Wisconsin. Law enforcement also recovered the referenced tracking device that was affixed to the battery of Vehicle 255.

### Vehicle 260: Red 2023 Chevrolet Corvette
### (Manufactured VIN: 1G1YD2D33P5603005)

33. In September 2023, SHIELDS had a known associate rent Vehicle 260 via Turo in Georgia. Based on my review of SHIELDS' cell phone text communications with others, I believe that on September 27, 2023, SHIELDS stole Vehicle 260 with the aid of an Optimus tracking device and a reprogrammed key. Assisted by JALEAN LITTLE, SHIELDS transported Vehicle

11

260 to Illinois and sold it to an individual in Wisconsin. SHIELDS kept the tracking device on Vehicle 260. With the assistance of CHANDOR SMITH and JALEAN LITTLE, SHIELDS stole Vehicle 260 a second time while it was still located in Wisconsin. SHIELDS then coordinated a second sale of Vehicle 260 to a female in Florida via one of SHIELDS' associates in Georgia. DEAMONTE LEE drove Vehicle 260 from Illinois back to Georgia.

34. Based on information in SHIELDS' phone, on September 29, 2023, JALEAN LITTLE, utilizing 773-587-1696, sent SHIELDS an image of a fuel gauge showing 114 miles. About 75 minutes later, SHIELDS sends an image to JAMONE HEGWOOD (initial purchaser of Vehicle 260) of an apparent red Corvette as viewed from a vehicle following the Corvette. Data from Optimus tracking shows that the tracker that was associated with Vehicle 260 was traveling from Georgia to Illinois during this timeframe. Prior text messages had indicated that LITTLE was in Georgia with SHIELDS. Based on my training, experience, and knowledge obtained from the case, I believe that LITTLE was transporting Vehicle 260 from Georgia to Illinois and SHIELDS was following him in a second car.

35. Based on information from SHIELDS' phone, on October 1, 2023, SHIELDS arranged to have Vehicle 260 brought to Milwaukee and provided HEGWOOD with the address of 1236 S Barclay, Milwaukee, Wisconsin. SHIELDS also provided this address to DEAMONTE LEE, utilizing call number 773-968-8167. Optimus tracking data confirmed that Vehicle 260 was at the referenced address at approximately 12:00 pm. At 1:40 pm, the tracking device was showing a location in the vicinity of 8572 North Granville Road, Milwaukee, Wisconsin.

36. Based on information in SHIELDS's phone, on October 8, 2023, at approximately 6:00 pm, SHIELDS communicates with CHANDOR SMITH and LITTLE regarding a meeting location. At approximately 9:59 pm, SMITH texts: "See if you can over pull it down", followed

12

by, "Try taking out the ignition switch". Optimus tracking data shows that the tracker associated with Vehicle 260 begins moving from 8572 North Granville Road, Milwaukee, Wisconsin, at around 11:50 pm. On October 9, 2023, at approximately 1:40 am, the tracker is located in the vicinity of 737 West Washington Boulevard, Chicago, Illinois, which I know to be a location utilized by SHIELDS to store stolen vehicles. Based on my training, experience, and knowledge obtained from the case, I believe that SHIELDS instructed LITTLE and SMITH to steal Vehicle 260 in Wisconsin and transport it to Illinois.

37. Based on information in SHIELDS' phone, on October 9, 2023, HEGWOOD contacted SHIELDS and said that the Corvette buyer wanted to talk to SHIELDS because the buyer knows that SHIELDS stole the car. SHIELDS denied stealing the car back.

38. Based on information in SHIELDS' phone, on October 9, 2023, SHIELDS arranged with DEAMONTE LEE, utilizing call number 773-968-8167, to drive Vehicle 260 to Atlanta the following morning. SHIELDS continued to converse with the buyer in Georgia providing him updates on Vehicle 260.

39. Based on information in SHIELDS' phone, on October 10, 2023, SHIELDS provides instructions to LEE, utilizing call number 773-968-8167 about driving Vehicle 260 to Georgia and where to drop it off. Optimus tracking data showed Vehicle 260 traveling from Illinois to Georgia. SHIELDS then arranges a flight back to Chicago for LEE.

**Vehicle 053: White 2021 Chevrolet Corvette**

**(Manufactured VIN: 1G1YB2D43M5108152)**

40. In June 2023, SHIELDS had a known associate rent Vehicle 053 via Turo in Missouri. Per discussions from SHIELDS' phone, SHIELDS had traveled to Missouri with LASHAWN DAVIS and the Turo renter. Based on my investigation, I know that the owner of

13

Vehicle 053 reported it stolen on July 2, 2023. SHIELDS' communications with others supports that SHIELDS and associates stole Vehicle 053. Communications from SHIELDS' phone suggests that SHIELDS and associates left Vehicle 053 in a storage unit in Kansas and drove another stolen vehicle back to Illinois. I believe that approximately ten days later, PATRICK STONE and LASHAWN DAVIS traveled to Kansas to get Vehicle 053 and drive it back to Illinois. Based on communications, SHIELDS then directs DEAMONTE LEE to drive Vehicle 053 from Illinois to Atlanta where SHIELDS sells it to a known associate. Law enforcement recovered Vehicle 053 in Georgia in September 2023.

41.     Per DAVIS's phone, recovered during his traffic stop and arrest in in western Wisconsin in August 2023, on July 7, 2023, DAVIS texts STONE that they are hitting the road on Sunday. I believe this text message is consistent with DAVIS' travel regarding Vehicle 053.

42.     Per DAVIS's phone, on July 11, 2023, DAVIS coordinates the acquisition of a rental car with a known female associate of SHIELDS. The rental is secured from the airport in Milwaukee. On the same day, DAVIS texts STONE that it is going to be a long drive, and they might not get back until six the next morning. DAVIS arranges to pick STONE up in Illinois.

43.     Per DAVIS's phone, on July 11, 2023, at approximately 10:13 pm, location data resolves to the area of Overland Park, Kansas. Per SHIELDS' phone, SHIELDS had rented a storage location in this area during their previous trip to Missouri when they stole Vehicle 053. From this point forward, location data from DAVIS' phone is consistent with travel back to the Chicago area.

44.     Per DAVIS' phone, on July 12, 2023, at approximately 3:55 am, DAVIS texts STONE to turn off the brights. About the same time, DAVIS tells SHIELDS that they are about two hours out. At approximately 6:11 am, DAVIS texts SHIELDS that they are "here" with

14

DAVIS' location data resolving to area of Berwyn, Illinois. At 9:00 am, DAVIS' location data resolves to Milwaukee. Based on my training, experience, and knowledge gained from the investigation, I believe STONE and DAVIS traveled to Kansas together in a rental car to retrieve Vehicle 053. They then returned to Illinois with one driving the rental and one driving Vehicle 053. After dropping Vehicle 053 off to SHIELDS in Illinois, DAVIS returned to his residence in Milwaukee, Wisconsin.

45. Based on information from SHIELDS' phone, on July 18, 2023, SHIELDS texts DEAMONTE LEE at call number 773-968-8167: "You want to drive the vet to the A?" LEE responded that he would do so. In the following days, SHIELDS and LEE discuss obtaining a flight from Atlanta to Chicago. Based on my training and experience, I believe SHIELDS had LEE drive Vehicle 053 from Illinois to Georgia to deliver the car to the buyer who is a known associate of SHIELDS. Additionally, per records received from the North Dakota Department of Motor Vehicles and the Wisconsin Department of Financial Institutions, Vehicle 053 was registered with a fraudulent VIN in North Dakota using a fictitious business that was registered in Wisconsin called "Kat Groomer LLC".

46. As described above, DEAMONTE LEE has a close associate with many of his co-defendants including DIAUNTE D. SHIELDS, LASHAWN DAVIS, and BRIANNA SHIELDS, and this relationship dates back years. The evidence as described shows that he was regularly communicating using his cell phone assigned call number 773-968-8167 about the sale, possession, and transport of stolen vehicles. I also know that DEAMONTE LEE has engaged in Cash App transactions with co-conspirators, which are often conducted using a cell phone such as the Device, and has sent and received messages and other content relating to the sale, possession, receipt, and transportation of stolen vehicles via cell phone such as the Device. Investigators have

15

previously identified DEAMONTE LEE's rental of a storage unit in his own name, and containing evidence connected to DIAUNTE SHIELDS. Investigators previously identified an email address deamonted188@gmail.com and Cash App account $Dough98 associated with DEAMONTE LEE on DIAUNTE SHIELDS's and LASHAWN DAVIS's cell phones. Investigators also previously identified his use of the email address ohiolawndale@gmail.com from DIAUNTE SHIELDS's cell phone.

47.     The Device is currently in the lawful possession of the FBI. It came into the FBI's possession in the following way: A warrant was issued for DEAMONTE LEE's arrest based upon the indictment. On June 26, 2025, DEAMONTE LEE was arrested by law enforcement at 1107 South Mozart Street, 1R, Chicago, Illinois. Search incident to that arrest and an inventory search, the Device was recovered from DEAMONTE LEE. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

48.     The Device is currently in storage at FBI's Milwaukee Field Office, which is located in the Eastern District of Wisconsin.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

**TECHNICAL TERMS**

49.     Based on my training and experience, I use the following technical terms to convey the following meanings:

16

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna

17

can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

18

50.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

51.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

52.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

j.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

k.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

l.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users

19

typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

m. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

53. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

n. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

o. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

p. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

q. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

20

r. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

s. I know that when an individual uses an electronic device to sell and purchase stolen vehicles, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

54. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

55. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

<u>**CONCLUSION**</u>

56. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## ATTACHMENT A

The property to be searched is an Apple iPhone assigned FBI Evidence Number 1B210 ("Device"). The Device is currently located at the FBI's Milwaukee Field Office, which is located in the Eastern District of Wisconsin.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 371, 511, 514, 1001, 1028A, 1956, 2312, 2313, 2321, and 2(a) and involve DEAMONTE LEE, DIAUNTE D. SHIELDS, LASHAWN DAVIS, JR., BRIANNA SHIELDS, and other co-conspirators known and unknown, since January 2019 including:

a. Information about stolen vehicles, including but not limited to photographs and videos of stolen vehicles, communications about stolen vehicles, records related to vehicle repair shops, records related to vehicle identification numbers and titles, records related to the transportation of vehicles, records related to the advertisement of vehicles, and records related to other preparatory steps taken in furtherance of the scheme;

b. Information about the existence, scope, members, and steps taken in furtherance of the conspiracy;

c. Information about false statements made by Deamonte Lee on or about June 26, 2025;

d. types, amounts, and prices of vehicles purchased, sold, and transported, as well as dates, places, and amounts of specific transactions;

e. any information related to sources of stolen vehicles (including names, addresses, phone numbers, or any other identifying information);

f. any information recording the subjects named above's schedule or travel from January 2019 to the present;

g. Evidence indicating how and when the device, call number, and email address was accessed or used, and by whom, to determine the geographic and chronological context of device access, use, and events relating to the crimes under investigation and to the account owner; and

h. Evidence indicating the device owner's state of mind as it relates to the crimes under investigation.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2